IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>vs.<br><br>BRYAN SCOTT MCMILLAN,<br><br>         Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§ Civil Action No.: 4:24-cv-919<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC"), for its Complaint against Defendant Bryan Scott McMillan ("McMillan" or "Defendant"), alleges as follows:

## SUMMARY OF THE ACTION

1.   On November 28, 2022, McMillan committed insider trading when he purchased shares of Apollo Endosurgery, Inc. ("Apollo") common stock, which was then a publicly traded company where McMillan's domestic partner ("Jane Doe") worked. McMillan purchased the stock on the basis of material nonpublic information obtained from Jane Doe. Specifically, McMillan learned that Apollo would be acquired by another company. Within minutes of learning of the planned acquisition, McMillan sold the securities of three other companies and purchased 20,000 shares of Apollo stock right before the stock market closed. The next morning, before stock markets opened, Apollo announced that it was being acquired for $10 per

1

share in a cash transaction, which caused Apollo's share price to increase more than 67 percent from the price at which McMillan had purchased it. As a result of his illegal insider trading, McMillan reaped profits of approximately $81,400.

2. By engaging in this conduct, McMillan violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and unless restrained and enjoined, will continue to violate the federal securities laws.

3. The SEC seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws by engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; (b) ordering Defendant to disgorge any ill-gotten gains he received with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), (5), and (7) [15 U.S.C. §§ 78u(d)(3), (5) and (7)]; (c) ordering Defendant to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; (d) ordering an officer and director bar against Defendant pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. §§ 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

4. The SEC brings this action pursuant to authority conferred upon it by Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d) and 78u-1].

5. This Court has jurisdiction over this action pursuant to Exchange Act Sections 21(d), 21(e), 21A, and 27(a) [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

6. Venue is proper in this Northern District of Texas pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. McMillan is an inhabitant of the District, and certain of the

acts, practices, courses of business, and transactions constituting the violations alleged herein occurred within the District, including McMillan's submission of the relevant securities trades.

## DEFENDANT

7. **Bryan Scott McMillan** is 54 years old and resides in Tarrant County, Texas. At all relevant times, McMillan and Jane Doe resided in Southlake, Texas. From approximately 2017 until 2023, McMillan was employed as a division president at a publicly traded medical technology company.

## OTHER RELEVANT ENTITIES AND INDIVIDUAL

8. **Apollo** was acquired by Boston Scientific Corp. in 2023. Prior to the acquisition, it was an SEC-reporting company with its securities registered under Section 12(b) of the Exchange Act and quoted on NASDAQ. Apollo was headquartered in Austin, Texas and developed, among other things, endoscopy products.

9. **Boston Scientific Corp.** ("Boston Scientific") has been an SEC-reporting company since 1995, and its securities are registered under Section 12(b) of the Exchange Act and are quoted on the New York Stock Exchange. Boston Scientific is a developer of medical devices incorporated in Delaware with a principal place of business in Marlborough, Massachusetts.

10. **Jane Doe** is 53 years old. At all relevant times, Jane Doe resided with McMillan in Southlake, Texas. Jane Doe started her employment at Apollo in 2012 and resigned in July 2023. At all relevant times, Jane Doe held a senior position at Apollo in which she received confidential and nonpublic information about Apollo as part of her employment.

## FACTUAL ALLEGATIONS

**A.  McMillan and Jane Doe Had a Long-Standing and Close Personal Relationship and Shared a Residence.**

11.  At all relevant times, McMillan and Jane Doe were in a committed relationship or domestic partnership with one another and had been in such a relationship since 2014.  McMillan and Jane Doe were best friends, shared a residence, vacationed together, spent holidays together with their extended families, and shared responsibilities for living expenses.  McMillan and Jane Doe agreed or understood, expressly or implicitly, that as part of their close personal relationship and cohabitation, each would come into possession of information about the other's personal life, family, and work, and that each would expect the other person to keep such information confidential.  Among other things, McMillan and Jane Doe's close relationship permitted them to enter each other's personal spaces within their shared home and to overhear private or work-related conversations in the home with the understanding that information obtained would still remain private and confidential between them.  The nature and length of McMillan and Jane Doe's relationship and living circumstances demonstrated a duty of trust and confidence between McMillan and Jane Doe.  As such, McMillan knew or reasonably expected that Jane Doe understood that McMillan would maintain the confidentiality of information she shared, and Jane Doe reasonably would have expected such confidentiality.

12.  McMillan owed a duty of trust and confidence to Jane Doe to maintain the confidential work information they shared or which he obtained from Jane Doe and to not trade on the basis of such information.

13.  At all relevant times, Jane Doe worked for Apollo from the home that she and McMillan shared in Southlake, Texas.  McMillian also periodically worked from that home.

4

**B.     Jane Doe and McMillan Were Obligated to Maintain Confidentiality and to Refrain from Trading Apollo Securities Based on Material Nonpublic Information.**

14.     At all relevant times, Apollo maintained written policies and procedures to protect its confidential information.  These included limiting how Apollo employees could use Apollo's confidential information and limiting when employees and their family members could trade Apollo's securities.

15.     Apollo's written policies, included in its "Code of Business Conduct and Ethics" and "Insider Trading and Trading Window Policy," provided examples of "inside information," which included "acquisitions or dispositions of assets, divisions, companies, etc."  Apollo's insider trading policies, which were incorporated by reference in its code of conduct, specifically prohibited employees who had inside information from trading in the company's stock, advising anyone else to do so, or communicating the information to anyone else before its public dissemination.  The policy applied to family members and other household members of Apollo employees.

16.     Jane Doe was aware that Apollo protected its confidential and nonpublic information and limited when its employees and their family members were permitted to trade Apollo's securities.  Jane Doe acknowledged Apollo's policies on insider trading and her obligation to comply with those policies through her signature, which Apollo required every two years.  Jane Doe was under a duty to keep Apollo's confidential and nonpublic information in confidence.

17.     McMillan was aware that his employer, a different publicly traded company, had a code of conduct which stated that employees "who have access to confidential information are not permitted to use or share that information for stock trading purposes . . . or to 'tip' others (including without limitation friends and Family Members) who might make an investment

decision on the basis of this information[.]". McMillan also received training on compliance with insider trading laws through his employer. McMillan was aware that his company's policy would not permit members of his family or friends to trade on its nonpublic information. Accordingly, McMillan, who in addition to working at a public company had previously worked as a broker, was aware of the sensitive nature of material nonpublic information relating to securities issuers and the duties and obligations attendant to the sharing of such information.

C.     **Boston Scientific's Acquisition of Apollo**

18.    In or about September 2022, one or more senior executives of Apollo engaged in discussions with one or more senior executives of Boston Scientific about a strategic acquisition of Apollo. Soon thereafter, negotiations for Boston Scientific's acquisition of Apollo began in earnest. Within Apollo, only a small circle of senior employees were aware of these discussions.

19.    On November 28, 2022, Apollo and Boston Scientific agreed on final terms for the transaction.

20.    That evening, Apollo's Board of Directors voted to approve the transaction. The acquisition was publicly announced before U.S. stock markets opened on the morning of November 29, 2022.

D.     **Jane Doe Learned of the Acquisition.**

21.    During the afternoon of November 28, 2022, a senior executive of Apollo informed multiple members of his management team – including Jane Doe – about the impending acquisition.

22.    Specifically, that day, at approximately 2:40 p.m. Central Time, the Apollo senior executive placed a telephone call to Jane Doe, who was at the Southlake, Texas home that she shared with McMillan. During the call, the senior executive shared material nonpublic

information with Jane Doe, specifically that Apollo was in advanced discussions to be acquired by Boston Scientific, that the deal was imminent and could be announced as early as the next day, and that Jane Doe would need to complete various work-related tasks for the acquisition.

23. The senior executive further conveyed to Jane Doe that the information was highly confidential, and Jane Doe understood that the information communicated to her by the senior executive was confidential and material nonpublic information.

24. The phone call between Jane Doe and the senior executive concluded at or about 2:48 p.m. Central Time.

E. **McMillan Purchased Apollo Stock on November 28, 2022 After Jane Doe Learned of the Acquisition.**

25. On November 28, 2022, McMillan started his workday at his office in Lewisville, Texas and then traveled home in time to participate in a work call scheduled for 3:00 p.m. Central Time.

26. Between approximately 2:40 p.m. and 2:50 p.m. Central Time, McMillan learned the material nonpublic information that the senior executive had shared with Jane Doe. Either McMillan misappropriated this information from Jane Doe in breach of his duty to her after she communicated this information to him in confidence or he overheard her confidential telephone conversation in their shared home; or Jane Doe tipped the material nonpublic information about the acquisition to McMillan in breach of a duty to Apollo and for personal benefit (*e.g.*, as a gift to a close friend or to receive additional household income). In whichever circumstance, McMillan breached a duty of trust and confidence by then trading on the basis of that information.

27. At 2:50 p.m. Central Time, approximately two minutes after the telephone call between Jane Doe and the senior executive concluded, McMillan logged in to his brokerage account from the home in Southlake, Texas.

28. Beginning at 2:53 p.m. Central Time, McMillan started placing orders to sell the securities of three different companies held in one of his accounts. Each of these stocks were sold at a loss but the combined sales generated more than $100,000 of cash in the account.

29. At 2:56 p.m. Central Time, McMillan used the proceeds from the sales of the three securities, as well as additional cash held in the account, to place a market order to purchase 20,000 shares of Apollo stock. Trades placed using a market order execute immediately at the best price available in the relevant market.

30. Prior to executing McMillan's market order to purchase Apollo stock, a representative of McMillan's brokerage firm called McMillan at 2:58 p.m. Central Time and stated to McMillan, in sum and substance and in part, that there was not substantial trading volume in Apollo stock, and that the market order placed by McMillan may cause the price of the Apollo stock to change, which could result in McMillan paying more than the current market price. The representative asked if McMillan wanted to change his market order to a limit order, which is an instruction to buy or sell a security at a specified price or better, rather than at the market price. McMillan responded, in sum and substance and in part, that he was aware the markets were closing in two minutes and wanted to send the order as a market order.

31. McMillan's brokerage firm executed his order to purchase 20,000 shares of Apollo stock at 2:58 p.m. Central Time, approximately two minutes before the close of the NASDAQ market. McMillan's purchase represented more than 25 percent of the total trading volume in Apollo stock that day.

32.     McMillan purchased Apollo stock on the basis of information about Apollo's impending acquisition. He knew, consciously avoided knowing, or was reckless in not knowing that the information was material and nonpublic and used that information in the purchase of Apollo stock, which was a substantial factor in his decision to purchase those securities. As set forth above, McMillan breached a duty of trust and confidence by trading on the basis of the information and, in so doing, McMillan acted with an intent to deceive or defraud.

33.     Following the November 29, 2022 announcement of Apollo's acquisition, the share price of Apollo's stock increased by approximately 67.8%, resulting in ill-gotten gains of $81,400 for McMillan.

### F.     Activity in Jane Doe's Brokerage Account

34.     On November 28, 2022, beginning shortly after the market closed and after McMillan's trades were executed, there were multiple unsuccessful attempts to purchase shares of Apollo stock in a brokerage account held by Jane Doe.

35.     At approximately 3:25 p.m. Central Time, Jane Doe's brokerage account placed a market order to purchase 149 shares of Apollo stock.

36.     Jane Doe's brokerage firm did not execute the order, and a minute later, Jane Doe's account replaced the order with a market order to purchase 125 shares of Apollo stock.

37.     Several hours later, in the early morning hours of November 29, 2022, prior to the announcement of the acquisition, the pending order to purchase 125 shares of Apollo stock was changed from a market order to a limit order with a limit price of $6.50 per share. This limit order was not executed because, following the announcement of the acquisition, Apollo's stock opened at a price of $9.80 on November 29th and traded at prices significantly above the $6.50

limit price for the entire trading day. After the close of trading on November 29th, Jane Doe's brokerage firm cancelled the unexecuted limit order.

38. On November 30, 2022, Jane Doe sold 145 shares of Apollo stock. This trade occurred after the announcement of the acquisition was made public, but the trade violated Apollo's internal policies including by (a) occurring less than two-full trading days following public dissemination of material nonpublic information; and (b) without Jane Doe having fulfilled Apollo's pre-clearance requirement for trading.

## CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

39. The SEC realleges and incorporates by reference paragraphs 1 through 38, as though fully set forth herein.

40. By virtue of the foregoing, McMillan, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon persons.

41. By virtue of the foregoing, McMillan directly or indirectly violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court:

I.

Find that Defendant McMillan violated the provisions of the federal securities laws as alleged herein;

II.

Permanently restrain and enjoin Defendant McMillan from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

III.

Order Defendant McMillan to disgorge all ill-gotten gains received during the period of the violative conduct, plus prejudgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

IV.

Order Defendant McMillan to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

V.

Order that Defendant McMillan be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

VII.

Grant such other and further relief as this Court may deem just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC demands trial by jury in this action of all issues so triable.

Dated:  September 26, 2024            Respectfully submitted,


/s/ James P. McDonald
Patrick Disbennett
Texas Bar No. 24094629
United States Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
Telephone: (817) 266-9633
Facsimile: (817) 978-4927
disbennettpa@sec.gov

James P. McDonald
New York Bar No. 4823910
*Pro Hac Vice* Application Pending
United States Securities and Exchange Commission
Denver Regional Office
1961 Stout St., Suite 1700
Denver, CO 80294
Telephone: 303-844-1059
Facsimile: 303-297-3529
McDonaldJa@sec.gov

COUNSEL FOR PLAINTIFF
U.S. SECURITIES AND EXCHANGE COMMISSION